1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW METTLER,<br><br>                              Plaintiff,<br><br>       v.<br><br>GOVERNMENT EMPLOYEES<br>INSURANCE COMPANY,<br><br>                              Defendant. | Case No. 18-cv-2303-BAS-MSB<br><br>**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 34]** |

       In 2018, Plaintiff Matthew Mettler sued Defendant Government Employees Insurance Company ("GEICO") for breach of contract and breach of the covenant of good faith and fair dealing. (ECF No. 1-2.) GEICO now moves for summary judgment on some of Plaintiff's claims. ("Mot.," ECF No. 34.) Plaintiff filed an opposition to the Motion, ("Opp'n," ECF No. 36), to which GEICO replied, ("Reply," ECF No. 38).[1] The Court finds this Motion suitable for determination on

---

[1] Along with its reply brief, GEICO submitted various objections to Plaintiff's evidence. (ECF No. 38-3.) The first piece of contested evidence is John DiMugno's report, which Plaintiff attached to his opposition. (ECF No. 36-3.) DiMugno opines on the issue of whether GEICO was obligated to provide Matthew with independent counsel. "[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). DiMugno provides an evaluation of the law

the papers and without oral argument.  Civ. L. R. 7.1(d)(1).  For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** GEICO's Motion.

## I.   BACKGROUND

Prior to August 1, 2015, GEICO issued an auto insurance policy to Kellie and Stephen Mettler with body injury liability limits of $100,000 per person.  (Joint Statement of Undisputed Material Facts, "JSUMF," ECF No. 38-4, at ¶ 1.)  On August 1, 2015, Kellie's teenaged son Matthew was driving her car and following another car being driven by his friend Elias.  (*Id.* ¶ 3.)  Matthew's phone was ringing because Kellie was calling him, so he looked down at his phone, negligently failed to stop in time, and rear-ended Elias' car.  (*Id.* ¶ 3; Mot. at 7.)  Elizabeth Cooke was a rear-seat passenger in the car being driven by Elias.  (*Id.* ¶ 2.)

On August 19, 2015, Cooke went to a chiropractor.  (GEICO's Exhibit 4, at 25.)[2]  On February 22, 2016, Kellie informed GEICO that she had been served with a lawsuit by Cooke.  (JSUMF ¶ 6.)  The lawsuit named both Matthew and Kellie.  (*Id.*)  The next day, GEICO appointed Beverly Mills to serve as defense counsel.  (*Id.* ¶ 7.)  Mills answered Cooke's complaint and served discovery.  On May 16, 2016, GEICO received from Mills a copy of Cooke's unverified interrogatory answers and document responses, including medical records.  (*Id.* ¶ 8.)  On June 23, 2016, Cooke's attorneys wrote to GEICO making a policy limits settlement demand of

---

surrounding the issue and a legal conclusion, and his report is therefore not proper.  The Court sustains GEICO's objection to the report.

GEICO also objects to various portions of the declaration of counsel Ryan Bright.  GEICO makes best evidence rule objections to the portions of Bright's declaration where he summarizes certain pieces of evidence.  *See* Fed. R. Civ. P. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.").  The Court sustains these objections; the documents speak for themselves.  Further, GEICO's objection to Bright's description of what occurred at mediation is moot because the Court did not consider Bright's statements in analyzing GEICO's motion.

[2] Both parties attach their extensive exhibits to their briefs as one large attachment.  Any page reference herein to exhibits, including depositions, refers to the CM/ECF pincite page number located at the top of the page.  Any reference to Plaintiff's Exhibits refers to the attachments at ECF No. 36-4 and any reference to GEICO's Exhibits refers to the attachments at ECF No. 34-4.

$100,000 in exchange for the release of Kellie and Matthew and the dismissal of the lawsuit. (GEICO's Exhibit 9, at 92.)  On July 7, 2016, GEICO rejected the settlement demand and provided a counteroffer of $12,900.  (JSUMF ¶ 10.)

On August 4, 2016, Cooke made a second policy limits demand in the form of a California Code of Civil Procedure section 998 offer, but it was only as to Matthew.  (*Id.* ¶ 11.)  GEICO rejected the offer and made a counteroffer of $16,000.  (*Id.* ¶ 12.)  On January 19, 2017, Cooke made another settlement demand for $350,000.  (*Id.* ¶ 13.)  This demand included a copy of the results of Cooke's MRI, which had been taken on December 22, 2016, and a report by Dr. Keshavarzi following an evaluation of Cooke on January 10, 2017.  (GEICO's Exhibit 11, at 107–111.)  Dr. Keshavarzi's report detailed Cooke's description of "migraines, left arm weakness, numbness and tingling in her left arm, and a throbbing pain in her left scapula."  (*Id.* at 110.)  Dr. Keshavarzi informed Cooke of a surgical option as an "aggressive treatment for the pain."  (*Id.*)  In February 2017, GEICO rejected the offer and made a counteroffer for $20,000.  (Plaintiff's Exhibit 25, at 221–22.)

On March 6, 2017, Cooke was evaluated in an independent medical examination ("IME") by Steven Schopler, a doctor chosen by GEICO.  (JSUMF ¶ 14.)  Dr. Schopler concluded that Cooke has "multilevel cervical spondylosis" and "would be a candidate for cervical spine reconstructive surgery."  (GEICO's Exhibit 13, at 121.)  He opined that "physical therapy, epidural injections, facet injections, trigger point injections, and acupuncture are unlikely to prove to be beneficial to her."  (*Id.*)  GEICO learned of Schopler's opinions on March 14, 2017.  (JSUMF ¶ 15.)  GEICO then offered a settlement of $100,000, which Cooke rejected.  (*Id.* ¶¶ 16, 17.)  GEICO transferred the defense of the Mettlers to the law firm of Tyson & Mendes.  (*Id.* ¶ 18.)

Cooke underwent a three-level anterior cervical discectomy and fusion surgery in June 2017.  (*Id.* ¶ 19.)  In April 2018, Cooke agreed to a settlement as to Kellie only for $15,000 to be paid by GEICO and the case went to trial against Matthew.

(*Id.* ¶ 20.)   Trial resulted in a jury verdict of $701,493; the judge then granted a motion to award prejudgment interest and costs based on the rejected Section 998 offer, leading to a total judgment of approximately $850,000.   (*Id.* ¶¶ 21, 22.) Matthew's attorney demanded GEICO pay the entire judgment.  (*Id.* ¶ 23.)  GEICO, Cooke, and Matthew participated in a private mediation, where GEICO reached a settlement with Cooke for a total of $500,000.   (*Id.* ¶¶ 24, 25.)   This settled any liability Matthew had to Cooke.  GEICO and Matthew did not reach a settlement, so Matthew filed the present suit.  (*Id.* ¶ 26; "Compl.," ECF No. 1-2.)

## II.    LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322–23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).  If the moving party

meets this initial burden, however, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." (citing *Anderson*, 477 U.S. at 242, 252)). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III. ANALYSIS

The Court first evaluates GEICO's rejection of Cooke's offers to settle for policy limits.

### A.   Cooke's June 23 $100,000 Settlement Offer

Plaintiff alleges GEICO acted in bad faith in rejecting Cooke's June 23 settlement offer of $100,000. GEICO argues its decision was reasonable as a matter of law and moves for summary judgment on Plaintiff's allegation of bad faith.

"In each policy of liability insurance, California law implies a covenant of good faith and fair dealing. This implied covenant obligates the insurance company, among other things, to make reasonable efforts to settle a third party's lawsuit against the insured." *PPG Indus., Inc. v. Transamerica Ins. Co.*, 20 Cal. 4th 310, 312 (1999). An insured may bring a claim against its insurer for wrongfully refusing to settle,

provided that the insured proves the existence of a reasonable offer to settle the claims against the insured for an amount within the policy limits of the insured's policy. *Graciano v. Mercury Gen. Corp.*, 231 Cal. App. 4th 414, 425 (2014) (citing *Merritt v. Reserve Ins. Co.*, 34 Cal. App. 3d 858, 877 (1973)). The insurer must settle a claim against the insured within policy limits if there is a "substantial likelihood of recovery in excess of those limits." *Johansen v. Cal. State Auto. Ass'n Inter-Ins. Bureau*, 15 Cal. 3d 9, 16 (1975). "In determining whether an insurer has given consideration to the interests of the insured, the test is whether a prudent insurer without policy limits would have accepted the settlement offer." *Crisci v. Sec. Ins. Co. of New Haven, Conn.*, 66 Cal. 2d 425, 429 (1967); *see also* Judicial Council of California Civil Jury Instruction 2334 ("A settlement demand for an amount within policy limits is reasonable if [name of defendant] knew or should have known at the time the demand was rejected that the potential judgment was likely to exceed the amount of the demand based on [name of plaintiff in underlying case]'s injuries or loss and [name of plaintiff]'s probable liability.").

The determination of whether an insurer's conduct rises to the level of bad faith must be determined on a case by case basis when considering all of the relevant circumstances. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001). The circumstances to consider when evaluating the reasonableness of the insurer's settlement decision are "wide-ranging" and include "motive, knowledge, experience, and the ability to prophesy." *Camelot by the Bay Condominium Owners' Ass'n v. Scottsdale Ins. Co.*, 27 Cal. App. 4th 33, 48 (1994). "[O]rdinarily whether the insurer has acted unreasonably, and hence in bad faith, in rejecting a settlement offer is a question of fact to be determined by the jury." *Cain v. State Farm Mut. Auto. Ins. Co.*, 47 Cal. App. 3d 783, 792 (1975). However, where there are no competing inferences allowing for reasonable minds to differ, the question of whether an insurer acted reasonably and in good faith becomes one of law. *Walbrook Ins. Co. v. Liberty Mutual Ins. Co.*, 5 Cal. App. 4th 1445, 1454–55;

*see also Chateau Chamberay*, 90 Cal. App. 4th at 346 (holding reasonableness is a question of law if "only one reasonable inference can be drawn" from undisputed evidence).

In Cooke's June 23 letter, she laid out her damages, noting she had incurred $11,079.40 in past medical bills and had past loss of earnings in the amount of $4,275.00. (Plaintiff's Exhibit 13, at 173.) She also stated she had claims for "general damages related to past pain and suffering," future medical bills, and future general damages for pain; she provided no monetary amount for these damages. (*Id.* at 175.) Cooke did not detail how her damages could exceed $100,000. On July 7, GEICO rejected the offer and provided a counteroffer of $12,900. (JSUMF ¶¶ 9, 10.) GEICO argues it did so because Cooke did not have a substantial likelihood of a recovery greater than $100,000. (Mot. at 13.) GEICO makes a point to note that only <u>after</u> it rejected the demand, Cooke got a second MRI, a doctor offered spinal fusion as a treatment, and GEICO's IME doctor opined that surgery was warranted. GEICO argues it was not until these events took place that the case became worth more than $100,000. (*Id.*)

The Court begins its analysis by assuming that on July 7, based on the information known to GEICO, the rejection of the $100,000 settlement was reasonable. Plaintiff does not directly dispute this, but instead focuses his argument on whether GEICO conducted an appropriate investigation before rejecting the offer. (Opp'n at 7–8.) Plaintiff argues that GEICO could have learned relevant facts earlier, and that GEICO did not conduct a reasonable investigation during the claims process to identify the necessary facts for it to determine whether Cooke's claims would likely exceed the policy limit.

An insurer "cannot rely on its breach of the duty to conduct a reasonable investigation to shield itself from liability for breach of the related duty to accept a reasonable settlement demand." *Safeco Ins. Co. of Am. v. Parks*, 170 Cal. App. 4th 992, 1009 (2009). To the extent that GEICO's failure to have sufficient information

1  to reject the offer was GEICO's own doing as a result of an unreasonable

2  investigation, then the decision not to accept Cooke's offer may ultimately still

3  constitute bad faith.  *See Spradlin v. GEICO Indemnity Co.*, No. 2:18-cv-10299-

4  SVW-KES, 2019 WL 5481304, at *22 (C.D. Cal. Aug. 1, 2019).

5      An insurer's investigation is unreasonable if the insurer "fails to consider, or

6  seek to discover, evidence relevant to the issues of liability and damages." *Shade*

7  *Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 880

8  (2000).  Consequently, if the insurer did not undertake an adequate investigation,

9  "the insurer is charged with constructive notice of facts that it might have learned if

10  it had pursued the requisite investigation."  *KPFF, Inc. v. Cal. Union Ins. Co.*, 56

11  Cal. App. 4th 963, 973 (1997) (citations omitted).  The determination of whether an

12  insurer's investigation was reasonable must be made on a case-by-case basis and

13  depends on the totality of the circumstances, but a determination of reasonableness

14  may be made as a matter of law based on undisputed evidence supporting only one

15  reasonable inference.  *See Chateau Chamberay*, 90 Cal. App. 4th at 346.

16      The Court begins by evaluating the reports and opinions of Beverly Mills, who

17  represented GEICO in the beginning of the case.  Mills was fully involved in the case

18  early on and prepared thorough reports regarding her impressions and opinions.  In

19  a report dated March 2, 2016, Mills referenced the reports of a chiropractor, Dr.

20  Singh.  Singh's "extremely minimal records" showed Cooke was complaining of

21  headaches and pain, and an MRI showed bulges.  (Plaintiff's Exhibit 10, at 160.)

22  Mills noted she did not have any other medical records at the time.  (*Id.*)  In her report

23  dated April 13, 2016, Mills noted she had received more medical records, and she

24  detailed reports by a chiropractor, radiologists (who performed x-rays and an MRI),

25  physical therapists, and others.  (Plaintiff's Exhibit 11, at 164.)  Mills opined that

26  "the good news is that [Cooke's neurosurgeon] Dr. Rahimifar did not think that

27  [Cooke] is a surgical candidate."  (*Id.* at 166.)  Mills also opined, "I think that a

28  biomechanical engineer could look at the photographs of the [car] . . . and help us

– 8 –

1    ascertain the forces exerted on [Cooke] in this accident, if this matter were to proceed

2    to trial." (*Id.*) Mills concluded that they could "discuss whether to have [Cooke]

3    examined and/or her medical records reviewed" after Mills deposed Cooke. (*Id.*) On

4    June 9, 2016, Mills deposed Cooke's two daughters, who were in the car at the time

5    of the accident, and Elias, the driver of the car. (Plaintiff's Exhibit 12, at 169.) Mills

6    concluded that "between what we might see on subrosa, an accident

7    reconstruction/biomechanical investigation, and [Cooke's] own private medical

8    providers' records, we might be able to establish that this woman was not injured, or

9    at least to the extent claimed." (*Id.* at 170.) Later that month, Cooke made the

10   $100,000 settlement offer.

11       On July 7, 2016, Cooke was deposed. In Mills' summary of Cooke's

12   deposition, she opined that Cooke "greatly exaggerated" her complaints and Mills

13   "[did] not believe that [Cooke] was hurt in this incident." (Plaintiff's Exhibit 16, at

14   184.) Mills concluded, "I want to have her records reviewed, and her examined

15   (probably by a neurosurgeon). I strongly urge as well that we consider retaining a

16   biomechanical engineer, I just don't see that the forces necessary to injure a woman

17   in prime physical condition . . . were present in this accident." (*Id.* at 186.) Mills

18   noted that she believed Cooke had only minimal complaints, "but considering that

19   she is still treating extensively, and getting injections and occipital blocks, I am

20   concerned about our clients' policy limits." (*Id.*)

21       Also on July 7, 2016, GEICO rejected Cooke's $100,000 settlement demand.

22   (Plaintiff's Exhibit 15, at 182.) The decision was made by David Fetchina, the

23   regional liability administrator in GEICO's claims department. ("Fetchina Decl.,"

24   ECF No. 34-3, at ¶ 1.) Fetchina directed GEICO adjuster Adria Shaw to reject the

25   offer. Shaw did so and made a $12,900 counteroffer. (*Id.* ¶ 57.) It appears that Shaw

26   did not read Cooke's deposition before making the counteroffer. ("Shaw Depo.,"

27   Plaintiff's Exhibit 3, at 68.) It is unclear whether Fetchina reviewed Cooke's

28   deposition or the summary before he authorized the rejection.

1    Fetchina declares that he "felt confident about GEICO's ability to settle" for
2    approximately $35,000.  (Fetchina Decl. at ¶ 24, 25.)  He based this decision on the
3    medical records he had at the time.  A "key component" of this determination was
4    neurological surgeon Dr. Imad Abumeri's medical opinion.  (*Id.* ¶ 46.)  On November
5    9, 2015, Dr. Abumeri determined that Cooke is "not a surgical candidate . . . and her
6    injuries most likely are soft tissue injury/muscular injury."  (GEICO's Exhibit 37, at
7    213.)  Prior to seeing Dr. Abumeri, Cooke had participated in physical therapy and
8    chiropractic treatments.  Her chiropractor noted her progress over time, recording
9    that her movement had improved at each visit. (GEICO's Exhibits 25–29, at 174–
10   182.) The physical therapy reports also noted Cooke's progress.  On November 3,
11   2015, Cooke was reported as having a "40% improvement in neck, upper back pain
12   [and a] >90% improvement in headaches with Physical Therapy intervention."
13   (GEICO's Exhibit 35, at 200.)

14   But the medical records show that Cooke continued treatments and therapy
15   following her appointment with Abumeri and with physical therapists.  Cooke
16   received an MRI in September 2015.  (GEICO's Exhibit 31, at 186.)  A pain
17   management specialist opined that Cooke was still complaining of neck pain and
18   headaches in December 2015.  (GEICO's Exhibit 38, at 216.)  He scheduled Cooke
19   for trigger point injections in the trapezius muscles.  (*Id.*)  Later that month, Cooke
20   received two injections of methylprednisolone and Marcaine.  (GEICO's Exhibit 39,
21   at 218.)  In a follow-up visit, Cooke reported that the injections gave her four to five
22   days of relief "but then she overworked herself and now her pain is back" with
23   increased headaches.  (GEICO's Exhibit 40, at 220.)  In January 2016, Cooke was
24   put under anesthesia and was given an occipital nerve block.  (GEICO's Exhibit 41,
25   at 222.)

26   On July 7, 2016, GEICO informed Cooke's counsel that it only had records up
27   to January 2016, so Cooke's counsel sent GEICO additional medical records,
28   including: physical therapist's opinions that Cooke was still feeling weakness,

occasional tingling, pain, and limitations; doctor's notes indicating a positive Spuring test; and evidence that Cooke had received a cervical epidural injection under anesthesia in June 2016. ("Bright Decl.," ECF No. 36-2, at ¶ 27–34.) Also on July 7, 2016, Fetchina authorized Shaw to reject the June 23 policy demands limit. (Fetchina Decl. ¶ 55.)

Turning first to the opinions of GEICO's counsel Mills, the Court notes that a common thread throughout the correspondence between Mills and GEICO was Mills' opinion that Cooke was not as injured as she claimed to be, but that Mills believed that the issue could be resolved by more investigation. Specifically, Mills mentioned a biomechanical investigation more than once and noted she wanted to see more records. A biomechanical investigation was not done by the time GEICO rejected the settlement offer. Mills has at least "thirty years of litigation experience, including many years with a successful track record of defending GEICO insureds in auto crash cases with skill, care, and expertise." (Fetchina Decl. ¶ 15.) Mills had personally met Cooke and evaluated her behavior and credibility, and she had clearly delineated her opinions—that Cooke was exaggerating her injuries but that an IME or biomechanical review could confirm this. (*See, e.g.*, GEICO's Exhibit 43, at 229 (on July 7, 2016, Mills opined "I want to have [Cooke's] records reviewed, and her examined (probably by a neurosurgeon.) I strongly urge as well that we consider retaining a biomechanical engineer . . .").) Yet without following Mills' recommendations, Shaw and Fetchina formed the opinion that the medical evidence did not establish a case of more than $100,000.

And while it is apparent that Fetchina reviewed Cooke's medical records,[3]

---

[3] In his declaration, Fetchina summarizes "all of the medical records in GEICO's claim file as of July 7, 2016, when [he] authorized" Shaw to reject the June 23 demand. (Fetchina Decl. ¶ 55.) The latest record in this summary is dated January 2016. (*Id.* at ¶ 53.) But, Cooke's counsel declares that on July 7, 2016, he sent additional medical records to GEICO which detailed Cooke's medical appointments from April 2016 to June 2016. (Bright Decl. ¶¶ 26–33.) The timeline of this is unclear, and the parties do not specify whether Fetchina reviewed Bright's July 7 production before authorizing the rejection of Cooke's settlement demand. If Fetchina did not review the new

– 11 –

prepared calculations, and used his experience of evaluating "thousands" of bodily injury cases before rejecting the offer, the issue is, were enough steps taken before the conclusion was reached?  (*See* Fetchina Decl. ¶ 56.)  It was undisputed that Matthew was liable for the accident and that Cooke had not played a part in the cause of the collision. (JSUMP ¶4.) Fetchina and Shaw had evidence that Cooke had seen quite a few doctors and had sought relief through many different forms of treatment. (Shaw Depo. at 61; *see also* Bright Decl. ¶ 24 ("At the time of the June 23, 2016 demand, Elizabeth Cooke attended approximately 75 medical visits as a result of this crash, including chiropractic care, radiology, physical therapy, primary care physician, pain management, and orthopedic specialists.").)  GEICO knew that Cooke was complaining of stiffness, headaches, and pain; she had not experienced these symptoms prior to the incident.  (*See* Shaw Depo. at 64.)  It is apparent from Cooke's medical records that she was not healed or even on the path to recovery by July 2016; despite trying many different methods and treatments, she was still in pain, stiff, and had limited movement.

Despite this information, at the time GEICO rejected the settlement offer, it had not asked for a biomechanical review of the forces.  Nor had GEICO submitted Cooke to an IME.  To be sure, it was Cooke's own doctor who had opined that she was not a candidate for surgery, so GEICO may have thought an IME was unnecessary.  But still, Cooke's medical records consistently showed her injury persisted.  An IME was conducted later, after July 2016, but Fetchina testified he does not know the cause of the delay.  ("Fetchina Depo.," Plaintiff's Exhibit 4, at 77.)  He "would have liked it to have happened earlier" but "it slipped through the cracks, vacations, holidays, schedule of the doctor.  There's a lot of factors that help extend these things unnecessarily."  (*Id.* at 80.)  He testified that GEICO could have

---

records, the Court finds this creates a genuine issue of material fact as to whether it was reasonable for him to reject the offer without reviewing all medical records.  Therefore, for purposes of the below analysis, the Court assumes Fetchina reviewed all records.

asked for an extension of time to have an IME conducted before responding to the settlement demand, and that there would have been no harm in doing so, but no extension was requested. (*Id.* at 77.) He testified that an IME would have "made a difference" and "that's why it was being considered." (*Id.* at 79.)

GEICO eventually submitted Cooke to an IME by Dr. Schopler in March 2017. (JSUMF ¶ 14.) This was done "[t]o confirm that [Cooke's] doctor opinion was correct." (Shaw Depo. at 69.) Shaw testified that getting an IME is "usually the process that happens in litigation. [It's] standard with every other litigated case." (*Id.*) Following the IME, Dr. Schopler opined that Cooke was a candidate for surgery. (GEICO's Exhibit 13, at 121.) Shaw testified that had the IME been conducted before GEICO rejected Cooke's policy limits offer, it would have "likely" changed the offer GEICO made. (*Id.*) Of course, this change of GEICO's opinion of the case is evident; after receiving the IME results, GEICO offered to settle with Cooke for $100,000. GEICO also eventually consulted with a biomechanical/ accident reconstructionist, Isaac Ikram. Although the date of the consultation is unclear, in September 2017, GEICO's counsel summarized Ikram's report as "not favorable" because Ikram concluded that "based on 1) [Cooke's] left sided neck complaints, and 2) her head [was] turned to the right [when the impact occurred], there are good biomechanical explanations for plaintiff's asymmetric neck complaints and the presence of radicular symptoms that required corrective surgery." (Plaintiff's Exhibit 24, at 213–14.)

The Court finds that whether or not it was reasonable for GEICO to reject the policy limits offer without performing a biomechanical review or an IME is a disputed issue of fact. GEICO's decision-makers believed Cooke's medical records did not show a high-dollar case, but they made this determination before these potentially crucial steps were taken. The Court is not holding that simply because Plaintiff has pointed to a step that GEICO did not take before rejecting the settlement offer, this may make GEICO's conduct unreasonable. *See Maynard v. State Farm*

*Mut. Auto. Ins. Co.*, 499 F. Supp. 2d 1154, 1163 n.6 (C.D. Cal. 2007) (noting it is not the case that a plaintiff can "defeat summary judgment simply by pointing to any number of additional expert reports that the insurer could have—but failed to—obtain that would have somehow better informed its evaluation of Plaintiff's claim"). Instead, what raises a disputed issue of fact is whether GEICO should have hired a biomechanical expert or submitted Cooke to IME following Mills' suggestions and expressed "concern" about GEICO's policy limits, as well as the medical records showing Cooke's lack of progress in recovery.  Without undisputed evidence of a reasonable investigation, it cannot be said that GEICO's rejection of the policy limits offer was reasonable as a matter of law.  The Court **DENIES** GEICO's Motion for Summary Judgment as to this issue.

### B. Cooke's CCP Section 998 Offer (August 4, 2016)

Cooke's other settlement demand within policy limits was made in August 2016 in the form of a California Code of Civil Procedure section 998 offer.  (JSUMF ¶ 11.)   GEICO rejected the settlement demand and provided a counteroffer of $16,000.  (*Id.* ¶ 12.)  GEICO argues that its refusal of this offer cannot form the basis of Plaintiff's bad faith claim.

Plaintiff argues GEICO's refusal of the offer was unreasonable.  But the first question is whether the offer itself was reasonable.  An offer is reasonable if

(1) its terms are clear enough to have created an enforceable contract resolving all claims had it been accepted by the insurer, (2) all of the third party claimants have joined in the demand, (3) it provides for a complete release of all insureds, and (4) the time provided for acceptance did not deprive the insurer of an adequate opportunity to investigate and evaluate its insured's exposure.

*Graciano*, 231 Cal. App. 4th at 425 (citations omitted).

The CCP Section 998 offer was a policy limits demand, but it was made only as to Matthew.  (JSUMF ¶ 11.) "[A]n insurer may, within the boundaries of good faith, reject a settlement offer that does not include a complete release of all of its insureds."  *Strauss v. Farmers Ins. Exch.*, 26 Cal. App. 4th 1017, 1021 (1994).

Therefore, GEICO is correct that the CCP Section 998 offer was not a reasonable offer. To the extent Plaintiff alleges that GEICO acted in bad faith in rejecting the Section 998 offer, (*see* Compl. ¶ 11), the Court **GRANTS** GEICO's Motion for Summary Judgment on this issue.

### C.   GEICO's Communication of a Settlement Offer

Plaintiff's complaint vaguely alleges that GEICO acted in bad faith by "unreasonably and/or intentionally refusing to communicate a settlement offer to Plaintiff." (Compl. ¶ 23.k.) Plaintiff does not provide details as to this unspecified settlement offer. GEICO moves for summary judgment on Plaintiff's claim that GEICO acted in bad faith by failing to communicate a $250,000 settlement demand. (Mot. at 26.) The settlement demand at issue occurred in an April 2, 2018 text between Poncho Baker (Cooke's trial counsel) and Kevin Place (one of GEICO's attorneys). Place was running late to an expert deposition and emailed Baker to tell him so. Baker emailed back, saying, "Pay 250K and call it a day!!" and Place responded, "Lol. If I could, I would." (Plaintiff's Exhibit 29, at 244.)[4]

"An insurer's duty to communicate a settlement offer arises even if the offer is made in excess of policy limits." *Saelee v. Progressive Classic Ins. Co.*, No. CIV. S05-2648WBSKJM, 2007 WL 120000, at *1 (E.D. Cal. Jan. 11, 2007) (citing *Heredia v. Farmers Ins. Exch.*, 228 Cal. App. 3d 1345, 1360 (1991). Under California law, an insurer acts in "bad faith" when it fails "to inform the insured of a compromise offer." *Id.* (quoting *Brown v. Guarantee Ins. Co.*, 155 Cal. App. 2d 679, 689 (1957). "[The] duty to communicate may be triggered by something less than a formal offer." *Id.*

---

[4] Plaintiff points out that in March 2018, prior to the relevant text conversation, Baker emailed Campbell, another one of GEICO's attorneys, and asked if GEICO "has any interest in resolving this case above the policy limits" and if not, he would request a continuance in another one of his trials. (Plaintiff's Exhibit 28, at 242.) Campbell responded that there was no change in GEICO's position. (*Id.*) Plaintiff does not appear to be arguing that the March 2018 email was an "offer" that should be communicated to the clients, but instead that it shows Baker was serious about settling the case if possible.

Place testified he is "sure" that the text conversation with Baker is something he "would have likely" relayed to Matthew and Kellie, but he did not have "a specific recollection of that conversation." ("Place Depo.," Plaintiff's Exhibit 7, at 147:8–18.) Kellie Mettler testified that she was not informed of any offer to settle the case for $250,000. (Plaintiff's Exhibit 40, at 282.) Further, Matthew's father testified that he had never heard that the "case could go away for $250,000" and if he had known of that opportunity, he would have paid the extra $150,000 so the case did not go to trial. (Plaintiff's Exhibit 9, at 155–56.) This shows that the Mettlers were harmed by the failure to communicate the offer, as they would have taken advantage of it had they known of it.

Without any evidence that the Mettlers knew of the offer and without any concrete answer by Place regarding the communication, there is at least a question of material fact as to whether the offer was communicated by GEICO's counsel. But, GEICO argues that even if the offer was not communicated, GEICO (as opposed to its counsel) did not learn of the offer until it had expired. Campbell informed GEICO's adjuster Russell Gardner on Saturday, April 7, 2018 that, "Baker stated in passing that trial could be avoided for $250,000." (GEICO's Exhibit 20, at 146.) Gardner testified he did not see this email until Monday, April 9, 2018, which was the first day of trial. ("Gardner Depo.," GEICO's Exhibit 49, at 261.) GEICO argues that by that time, the offer had expired, and it should not be held liable for its counsel's failure to communicate the $250,000 offer prior to trial.

The Court disagrees that it is undisputed that the offer expired on the first day of trial. From GEICO's perspective, the only information it had was Campbell's email, which stated "Baker stated in passing that trial could be avoided for $250,000." There is no information that Baker stated or implied that the offer must be accepted before April 9, and, in any event, Gardner testified that he received the email "the morning of the trial" so it is possible trial had not yet begun when he learned of the offer. (*See* Gardner Depo. at 261.) Therefore, at the very least,

GEICO's adjuster learned of the settlement offer on April 9, 2018, and there is no evidence that anyone at GEICO communicated the offer to the Mettlers. Gardner believed that Place had informed the Mettlers of the offer, (*id*. at 262), but Place testified that he does not know whether he told Gardner that he had done so. (Place Depo. at 139.) And as noted above, Place cannot definitively say that he told the Mettlers of the offer. There is a disputed issue of material fact as to whether GEICO informed the Mettlers of a settlement offer, as GEICO had a duty to do. For these reasons, the Court **DENIES** GEICO's Motion for Summary Judgment on the claim of bad faith for its failure to communicate the $250,000 settlement offer.

### D.   Punitive Damages

Finally, GEICO seeks summary adjudication on Plaintiff's punitive damages claim.

"In order to establish that an insurer's conduct has gone sufficiently beyond mere bad faith to warrant a punitive award, it must be shown by clear and convincing evidence that the insurer has acted maliciously, oppressively or fraudulently." *Mock v. Michigan Millers Mut. Ins. Co.*, 4 Cal. App. 4th 306, 328 (1992). "This higher clear and convincing evidentiary standard applies at every stage of the litigation process, including summary adjudication." *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219, 1231 (C.D. Cal. 2002) (citing *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1121 (2001)).

Plaintiff bases his punitive damages claim on the conduct of Fetchina and Shaw. Under California law, an employer may be liable for punitive damages based upon acts of an employee if the employer "authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. Further, "[w]ith respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." *Id.* Plaintiff argues that Fetchina

and Shaw were "managing agents" and GEICO does not seem to dispute this.  *See Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 823 (1979) (holding that punitive damages could be awarded against an insurance company based on the tortious acts of its claims representatives).

Plaintiff lays out all actions that he believes form the basis for a punitive damage claim: Fetchina authorizing Shaw to reject the first two policy limits demands (without an IME and without reading Cooke's deposition transcript), Fetchina authorizing Shaw to reject Cooke's $350,000 demand despite a doctor's surgical recommendation, and Fetchina and Shaw's mishandling of the case once a conflict of interest formed between GEICO and Matthew.  (Opp'n at 26–27.)

The Court addresses the conflict of interest issue first.  As background and as noted above, GEICO rejected Cooke's two policy limit demands, and Cooke made a third demand of $350,000 in January 2017.  In the demand letter, Cooke's counsel stated that GEICO's rejection of the two earlier demands created a conflict of interest between GEICO and the Mettlers because if GEICO "had agreed to pay the previous policy demand, [the Mettlers] would not be required to contribute $250,000 to resolve this case."  (Plaintiff's Exhibit 33, at 253.) Cooke's counsel recommended that GEICO provide the Mettlers with independent counsel.  (*Id.*)  GEICO then communicated the $350,000 settlement offer to Matthew and reminded him, "our office is representing you only to defend this lawsuit, and you also may hire another lawyer, at your own expense, to monitor the defense being provided and/or to discuss your rights."  (Plaintiff's Exhibit 34, at 255.)

Although the evidence supporting the claims is unclear to the Court, Plaintiff alleges that GEICO then created a "Chinese Wall" or a "split file" between the Mettlers' original file and a new file to avoid a conflict of interest.  (Opp'n at 21.) Plaintiff alleges GEICO violated the split file by allowing GEICO employees on both sides of the wall to communicate.  (*Id.* at 22.)  Plaintiff also alleges GEICO should have paid for independent counsel for Matthew due to a conflict of interest.  The right

to independent counsel paid for by an insurer is generally referred to as "*Cumis* counsel" due to the California Supreme Court's decision in *San Diego Navy Federal Credit Union v. Cumis Ins. Society Inc*., 162 Cal. App. 3d 358 (1984). "The *Cumis* opinion was codified in 1987 by the enactment of Civil Code section 2860, which 'clarifies and limits' the rights and responsibilities of insurer and insured as set forth in *Cumis*." *James 3 Corp. v. Truck Ins. Exch*., 91 Cal. App. 4th 1093, 1100 (2001) (citations omitted).

The Court first addresses the propriety of this argument. Plaintiff has not previously alleged that GEICO acted improperly by failing to appoint counsel or that it violated the "Chinese wall" after splitting the Mettler file. The only reference to this argument is one sentence in Plaintiff's complaint where he alleges that GEICO breached its duty of good faith and fair dealing by "unreasonably and/or intentionally compelling Plaintiff to retain counsel during and after the pendency of the underlying lawsuit to protect and promote their [sic] legal interests against GEICO." (Compl. ¶ 23.h.) Allowing Plaintiff to use this brief reference now as the basis for his punitive damages claim would be unduly prejudicial. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (in evaluating a motion for leave to amend, holding that "adding a new theory of liability at the summary judgment stage would prejudice the defendant").

And in any event, the California code section regarding conflicts of interest specifically provides that "[n]o conflict of interest shall be deemed to exist as to allegations of punitive damages or be deemed to exist solely because an insured is sued for an amount in excess of the insurance policy limits." Cal. Civ. Code § 2860(b). Plaintiff tries to distinguish this by arguing that the code section does not excuse an insurer from providing *Cumis* counsel "once a claimant makes a demand within policy limits and there is a 'likelihood' of liability in excess of policy limits." (Opp'n at 23.) Plaintiff cites no authority supporting this proposition, nor can the Court locate any. Thus, for these reasons, the *Cumis* counsel claim cannot be used

to support Plaintiff's punitive damages claim.

The Court turns to the other allegations which Plaintiff argues form the basis of his punitive damages claim.  Plaintiff argues that Shaw and Fetchina willfully and consciously disregarded the Mettlers' rights, conducted an inadequate investigation, made "undifferentiated low ball offers[,]" relied on facts supporting GEICO's position and disregarded those that did not, fired defense counsel for protecting Matthew's interests instead of GEICO's, and did not comply with the "Chinese wall."  (Opp'n at 28.)  For the most part, these are the same allegations that form Plaintiff's bad faith claim.

"[T]he evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different dimension' from that needed to support a finding of bad faith."  *Shade Foods, Inc.*, 78 Cal. App. 4th at 909 (2000); *see also Mock*, 4 Cal. App. 4th at 328  ("Evidence that an insurer has violated its duty of good faith and fair dealing does not thereby establish that it has acted with the requisite malice, oppression or fraud to justify an award of punitive damages.").  Because of this difference, California courts have held punitive damages are generally only available against insurance companies when there are "established policies or practices in claims handling which are harmful to insureds." *Mock*, 4 Cal. App. 4th at 329; *see also Hangarter*, 373 F.3d at 1013–14 (noting punitive damages are available against insurance companies where there is sufficient evidence of a "conscious course of conduct, firmly grounded in established company policy" (quoting *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 923 (1978))); *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1165 (9th Cir. 2002) (same).

Plaintiff points to actions that he believes GEICO performed improperly, but he has not provided any evidence that these actions were done with malice, oppression or fraud. *See Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1288 (1994) (holding conduct showing an insurer's "negligence or slipshod investigation" is not enough to support punitive damages).  And there is no evidence

before the Court showing a policy or pattern of GEICO disregarding the rights of its insureds. *See Mock*, 4 Cal. App. 4th at 329. Without this, Plaintiff has no claim of punitive damages. The Court **GRANTS** GEICO's Motion for Summary Judgment as to Plaintiff's punitive damages claim.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** GEICO's Motion for Summary Judgment, as detailed herein. Subject to the Order of the Chief Judge No. 18, *In re Suspension of Jury Trials and Other Proceedings During the Covid-19 Public Emergency* (S.D. Cal. Mar. 17, 2020), the Court orders the parties to contact the Magistrate Judge's chambers to reset their mandatory settlement conference. Upon conclusion of this conference, the parties shall coordinate with the Magistrate Judge to set new dates for a pretrial conference and trial.

**IT IS SO ORDERED.**

**DATED: April 15, 2020**

**Hon. Cynthia Bashant**
**United States District Judge**